1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDA SCHUPP,<br><br>                    Plaintiff,<br><br>          v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>                    Defendant. | Case No.  1:12-cv-00374-LJO-SAB<br><br>**FINDINGS AND RECOMMENDATIONS<br>RECOMMENDING THAT PLAINTIFF'S<br>SOCIAL SECURITY APPEAL BE GRANTED**<br><br>OBJECTIONS DUE WITHIN 14 DAYS |

Plaintiff Linda Schupp ("Plaintiff") filed this action seeking judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying Plaintiff's application for benefits under the Social Security Act.  (ECF No. 1.)  This matter was submitted to the undersigned magistrate judge for findings and recommendations pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 303.

Plaintiff applied for disability benefits due to degenerative disc disease and status-post cervical fusion.  For the reasons set forth below, the undersigned recommends that Plaintiff's social security appeal be granted and that this action be remanded to the Commissioner for further proceedings consistent with this opinion.

/ / /

/ / /

1

**I.**

**FACTUAL AND PROCEDURAL BACKGROUND**

On July 16, 2008, Plaintiff protectively filed an application for Social Security benefits. (AR 60.)  Plaintiff alleged a disability onset date of May 7, 2008.  (AR 60.)  Plaintiff's application was denied initially on September 12, 2008 and then denied upon reconsideration on January 6, 2009. (AR 60.) On January 7, 2009, Plaintiff requested a hearing before an ALJ.  (AR 60.)  On December 3, 2009, Plaintiff appeared and testified at a hearing before Administrative Law Judge Laura Speck Havens ("the ALJ").  (AR 60.)  At the hearing, Plaintiff was represented by an attorney.  (AR 60.)

On March 24, 2010, the ALJ issued her decision denying Plaintiff's application for benefits.  (AR 60-66.)  On December 20, 2011, the Appeals Council denied Plaintiff's request for review.  (AR 1-4.)

**A.    Plaintiff's Hearing Testimony**

At the hearing before the ALJ on December 3, 2009, Plaintiff testified that she was born on August 13, 1947, making her 62 years old at the time of the hearing.  (AR 38.)  Plaintiff has a high school diploma and attended about a year of college.  (AR 38.)  Plaintiff suffers from degenerative disc disease and depression.  (AR 39.)

Plaintiff received neck surgery in 2004.  (AR 44.)  Plaintiff returned to work, but had a surgery in May 2008 to address spinal fluid leakage.  (AR 44.) On May 7, 2008, the alleged onset of disability, Plaintiff was hospitalized a second time due to spinal fluid leakage.  (AR 39.) Plaintiff has not worked since that date.  (AR 39.)  After the second surgery in September 2008, Plaintiff's vertebra was stabilized, but Plaintiff was left in pain.  (AR 44.)

Prior to her disability, Plaintiff worked as a medical receptionist from 2003 to 2008 and as a massage therapist from 1992 to 2001.  (AR 39.)

Plaintiff currently lives in a house with her husband.  (AR 40.)  Plaintiff wakes up at 7:00 a.m., is able to dress and bathe herself without help, and does chores around the house such as cooking, washing dishes (with a dishwasher), mopping, sweeping and laundry.   (AR 40.) Plaintiff does not go grocery shopping or do yard work.  (AR 40.)  Plaintiff does not have any

hobbies.  (AR 40.)  Plaintiff watches TV for about two hours per day.  (AR 41.)  Plaintiff does not exercise.  (AR 41.)  Plaintiff can drive about five to seven miles at a time.  (AR 41.)

Plaintiff indicated that she has problems sleeping.  (AR 41.)  Plaintiff sleeps seven hours a night on average.  (AR 41.)

Plaintiff is taking Lexapro, Norco, Ambien and Flexeril.  (AR 42.)  Plaintiff testified that the Norco makes her "dizzy, kind of foggy, and unable to concentrate."  (AR 42.)  The Ambien makes Plaintiff sleepy.  (AR 42.)  Plaintiff sees a doctor "[e]very few months."  (AR 42.)  Plaintiff's depression causes lack of concentration and forgetfulness.  (AR 43.)  Plaintiff reported that the Lexapro "helps more than the other [medications]."  (AR 43.)

Plaintiff reported that she can walk or stand for 15-20 minutes at a time.  (AR 42.)  Plaintiff can sit for 20 minutes at a time.  (AR 43.)  Plaintiff can lift 2-5 pounds at the most.  (AR 43.)

Plaintiff reported pain in her neck, shoulders and head.  (AR 43.)  The neck pain is constant and makes her neck feel very stiff and tender.  (AR 43.)  Plaintiff's pain averages about 5 out of 10 with medication.  (AR 43.)  Plaintiff's range of motion is diminished.  (AR 44.)  Plaintiff has problems reaching overhead and in front.  (AR 44.)  At times, Plaintiff's pain gets very severe, causing her hands to tingle.  (AR 45.)  Plaintiff's pain prevents her from sitting at a computer for more than fifteen minutes at a time, from doing a lot of household chores or from looking down while lifting.  (AR 45-46.)  Plaintiff drives one or two times a month, about five to seven miles at a time.  (AR 46.)  Plaintiff avoids driving because it hurts when she uses the steering wheel or turns to look from side to side.  (AR 46.)

On a "bad day," Plaintiff feels the worst stiff neck pain and gets a headache.  (AR 46.)  The only comfortable position for her is lying down.  (AR 47.)  Plaintiff lies down for 4-5 hours at a time.  (AR 47.)  On "good days," Plaintiff tries to do household chores.  (AR 47.)  Plaintiff usually feels better in the morning and tries "to do something every day" in the morning.  (AR 47.)

/ / /

/ / /

B.      **Plaintiff's Medical Records**

On August 10, 2004, Plaintiff was seen by Dr. Donald P. Dudley, M.D. at the Sonora Regional Medical Center in Sonora, California.  (AR 212-213.)  Plaintiff reported four days of "intermittent, shooting, lancinating pain to her left shoulder, neck, and occasionally left side of face." (AR 212.)  The pain was intermittent and mild over the first few days, but became much more significant and severe.  (AR 212.)  Plaintiff did not note any weakness, but she did report a slight headache and subsequent foggy-headedness.  (AR 212.)  Dr. Dudley's assessment was "[l]eft neck and shoulder neuropathic pain, unclear etiology." (AR 213.)

Also on August 10, 2004, Plaintiff was seen by Dr. Gregory Schaner, M.D. at the Sonora Regional Medical Center.  (AR 209.)  Dr. Schaner performed a CT of the brain without contrast. (AR 209.)

On August 23, 2004, Plaintiff was seen by Dr. James C. Wilson, M.D. at the Sonora Regional Medical Center.  (AR 207-208.)  Plaintiff reported right sided headache and neck ache for the past fifteen years.  Dr. Wilson noted "[n]ormal MRI exam of the head performed with and without gadolinium." (AR 208.)

On September 8, 2004, Plaintiff received an MRI from Dr. Schaner at the Sonora Regional Medical Center.  (AR 193, 206.)  Plaintiff had reported a 15-year history of right-sided neck and jaw pain.  (AR 193.)  Dr. Schaner noted "[s]evere degenerative disk changes at the C5-6 and to lesser extent C6-7 with evidence of cord impingement by posterior osteophyte and/or hard disk protrusion and posterior spondylolisthesis of C5 on C6 and posterior spondylolisthesis." (AR 193.)

On September 20, 2004, Plaintiff received an MRI from Dr. Matthew J. Nesper, M.D. at the Sonora Regional Medical Center.  (AR 194, 205.)  Dr. Nesper noted "[s]evere C5-6 stenosis secondary to disk bulge and hypertrophic changes of the posterior element.... Otherwise negative MR of the cervical spine." (AR 194.)

On September 30, 2004, Plaintiff received surgery performed by Dr. Joseph M. Grant, M.D. at the ValleyCare Medical Center in Pleasanton, California.  (AR 190-192.)  Plaintiff's post-operation notes indicated that "[s]he did well postoperatively.  There were no significant

4

1  perioperative events."  (AR 197.)

2      On September 6, 2006, Plaintiff was seen by Dr. Geoffrey M. Riley, M.D. at Advanced

3  MRI of Pleasanton.  (AR 201, 203.)  Plaintiff complained of upper extremity weakness and

4  numbness on the right side.  (AR 201.)

5      On December 11, 2006, Plaintiff was seen by Dr. Robert W. Lyons, M.D. at Sonora

6  Regional Medical Center.  (AR 211.)  Plaintiff reported right-sided lumbar back pain.  (AR 211.)

7  Dr. Lyons diagnosed Plaintiff with "[r]ight lumbar muscle strain and spasm" and prescribed

8  Vicodin and Flexeril.  (AR 211.)

9      On March 14, 2008, Plaintiff was seen by Dr. Grant at the Northern California Spine

10 Institute.  (AR 267.)  Plaintiff presented with "left worse than right arm pain, which has been

11 present for the past 3-4 months."  (AR 267.)  Plaintiff also reported headaches, pain in her neck,

12 and numbness in her arms and hands.  (AR 267.)  Dr. Grant recommended an epidural injection,

13 with a possibility of another MRI depending on how Plaintiff responded to the epidural injections.

14 (AR 268.)  Dr. Grant also noted, in an addendum, that Plaintiff had called the office on March 18,

15 2008 and reported an episode of headaches and neck pain so severe that she was unable to

16 complete her workday.  (AR 268.)  Plaintiff was told to see a physician that day, either through

17 her primary care office or the emergency room.  (AR 268.)  Plaintiff requested an MRI of her

18 neck, which Dr. Grant ordered, but Plaintiff was also told that she needed to be evaluated for pain

19 on the entire right side and that the pain in her abdomen and leg would not likely be coming from

20 her neck.  (AR 268.)

21     On March 18, 2008, Plaintiff received an MRI of the cervical spine by Dr. Schaner at the

22 Sonora Regional Medical Center.  (AR 221-222.)

23     On March 24, 2008, Plaintiff was seen by Dr. Cesar Duclair, M.D. at the Northern

24 California Spine Institute.  (AR 265-266.)  Plaintiff was 3.5 years postop at the time.  (AR 265.)

25 Plaintiff complained of neck pain and upper extremities.  (AR 265.)  Plaintiff reported difficulty

26 combing her hair, holding up a book to read, or putting things in a cupboard.  (AR 265.)  Dr.

27 Duclair scheduled epidural injections for Plaintiff.  (AR 266.)

28 / / /

5

1     On April 8, 2008, Dr. Duclair performed a bilateral transforaminal epidural injection.

2  (AR 269.)

3     On May 2, 2008, Plaintiff was seen by Dr. Grant at the Northern California Spine

4  Institute.   (AR 264.)   Plaintiff was four years postop, and "developed aggressive neck pain,

5  posterior occipital pain, and bilateral radiating shoulder pain."  (AR 264.)  Dr. Grant noted that

6  Plaintiff "had epidural injection with no relief."  (AR 264.)  Plaintiff reported "difficulty with

7  activities of daily living."  (AR 264.)  Dr. Grant "recommended that we obtain CT myelogram for

8  better visualization at the C4-5 level."  (AR 264.)

9     On May 12, 2008, Plaintiff was seen by Dr. Schaner at the Sonora Regional Medical

10  Center.  (AR 219-220.)  Plaintiff reported neck pain and was evaluated for disk herniation.  (AR

11  219.)

12     On May 14, 2008, Plaintiff was admitted at ValleyCare Medical Center and was seen by

13  Dr. Raafat K. Zamary, M.D. for "severe headache status post CT myelogram of the CT spine."

14  (AR 234-235.)  Plaintiff "was in severe pain with stiffness, photophobia, and nausea."  (AR 234.)

15  Plaintiff was given a "foley catheter" and "lumbar epidural blood patch."   (AR 234.)   The

16  discharge summary noted that Plaintiff "improved significantly" prior to discharge.  (AR 234.)

17  Dr. Zamary noted that the severe headache and acute urinary retention diagnoses were resolved,

18  while the mild elevation of liver enzymes required a follow up.  (AR 234.)

19     Plaintiff was also seen by Dr. Charlene Hu, M.D. during the May 14, 2008 admission.

20  (AR 238-240.)  Dr. Hu noted a headache that was progressively getting worse with photophobia

21  and nausea.  (AR 239.)  Dr. Hu also noted that the headache "gets worse with standing up or

22  sitting up."  (AR 239.)  Dr. Hu noted that "suspicion for meningitis is very low, and ... the patient

23  is suffering most likely with a post lumbar puncture headache."  (AR 239.)

24     On May 17, 2008, Plaintiff was seen by Dr. Randall Kan, M.D.  (AR 244-245.)  Dr. Kan

25  noted that Plaintiff suffered from a "[p]ossible postdural puncture headache."  (AR 244.)  Dr. Kan

26  performed a "Lumbar epidural blood patch."  (AR 245.)  After the procedure, Plaintiff "noted that

27  her headache now persisted only in the frontal area."  (AR 245.)

28  / / /

On June 6, 2008, Plaintiff was seen by Dr. Grant at the Northern California Spine Institute for a follow-up.  (AR 262.)  Plaintiff "resolved her headache issues," "Meningitis was ruled out," and Plaintiff "recovered with a blood patch."  (AR 262.)  Plaintiff "still has neck pain and some arm pain, mostly myofascial pain."  (AR 262.)  Plaintiff was prescribed Pamelor to see if it relieved the pain and headaches, with a follow up in 3-4 months.  (AR 262.)

On August 5, 2008, Plaintiff was seen by Dr. Grant at the Northern California Spine Institute for a follow-up regarding her headaches.  (AR 261.)  Plaintiff reported that her headaches have reduced since taking Pamelor, but that there was a subtle increase in neck pain and left arm weakness.  (AR 261.)  Plaintiff stated that "when she grips a coffee mug she often will drop it, and she has had 2 falls since her last visit."  (AR 261.)  Plaintiff's physical examination "reveal[ed] subtly reduced grip strength on the left, intact on the right" and "subtle global weakness in the left upper extremity."  (AR 261.)  Dr. Grant noted "good range of motion of the cervical spine" and "mild tenderness of the right trapezius muscle."  (AR 261.)

On August 28, 2008, Plaintiff was seen by Dr. Jon Park, M.D. at Stanford Hospital.  (AR 310-314.)  Plaintiff reported headaches, neck pain and shoulder pain that got progressively worse in the past year.  (AR 310.)  Plaintiff reported difficulty opening bottles or hanging clothes.  (AR 311.)  Plaintiff felt much better when lying down and not moving.  (AR 311.)  Plaintiff also felt off balance and fell twice in May.  (AR 311.)  Plaintiff came to Stanford Hospital for a second opinion after Dr. Grant informed her that he recommended that Plaintiff continue conservative measures before considering surgery in the future (cervical spine fusion).  (AR 311.)  At the physical examination, Plaintiff did not appear to be in acute distress, but did "appear[] to have pain and [was] slightly uncomfortable."  (AR 312.)  Plaintiff had "decreased range of motion over cervical spine."  (AR 312.)  Plaintiff demonstrated "significant pain especially with testing of deltoid, triceps and biceps."  (AR 312.)  Plaintiff was able to ambulate without difficulty and "is able to heel walk and toe walk without difficulty."  (AR 312.)  Dr. Park reviewed Plaintiff's CT scans and MRI's and stated that Plaintiff's pain is likely caused by "a collapse of bones ... causing [a] screw to push into the level above the surgery cite at C4-C5 which is irritating the disk level most likely and irritating the nerve causing these symptoms."  (AR 313.)  Dr. Park recommended

1   removal of the instrumentation.  (AR 313.)

2       On September 11, 2008, Plaintiff received a Physical Residual Functional Capacity

3   Assessment from Dr. I. Ocrant, M.D.  (AR 270-274.)  Dr. Ocrant opined that Plaintiff could

4   occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for six hours, and sit for six

5   hours.  (AR 271.)  Dr. Ocrant further opined that Plaintiff could climb ladders no more than

6   occasionally, was limited in overhead reaching and should avoid concentrated exposure to noise.

7   (AR 272-273.)

8       On September 11, 2008, Plaintiff also received a Case Analysis from Dr. Ocrant.  (AR

9   275-276.)  Dr. Ocrant noted that Plaintiff could perform light household chores, read, walk half a

10  mile, stand up to an hour and sit for three hours.  (AR 275.)  However, it is unclear whether this

11  was information presented to Dr. Ocrant or if this was Dr. Ocrant's opinion based upon the

12  medical record.  Dr. Ocrant found Plaintiff to be partially credible because Plaintiff claimed

13  weakness in her hands but her March 2008 examination noted equal strength in her hands.  (AR

14  276.)  The Case Analysis also indicated that there were no objective findings supporting a less

15  than sedentary residual functional capacity.  (AR 276.)  Dr. Ocrant further noted that "FO noted

16  no obvious physical problems in face-to-face interview," "Pain Rx is far less than aggressive,"

17  "PQ indicates excellent writing and alleged stand/walk/sit limits between light and sed[entary],"

18  and "[i]maging indicates severity is mild w/o evidence for myelopathy or radiculopathy; 6/08

19  exam shows no significant neurologic findings – no weakness noted; ditto noted on 3/08 exam."

20  (AR 276.)

21      Also on September 11, 2008, Plaintiff was seen by Dr. Park at Stanford Hospital for a

22  follow-up.  (AR 315.)  Plaintiff reported pain at a level of 5-6 out of 10.  (AR 315.)  Plaintiff

23  expressed reluctance to take pain medications due to their side effects and "has been trying to

24  minimize her medication use."  (AR 315.)  Plaintiff further reported progressive weakness,

25  difficulty opening bottles, feeling off-balance and several falls.  (AR 315.)  On physical

26  examination, Plaintiff's "motor function is strong and symmetrically equal both upper and lower

27  extremities with subtle left deltoid, biceps, weakness on the left with complaints of pain."  (AR

28  317.)  Dr. Park again recommended removal of the previous hardware installed by Dr. Grant

during the September 2004 surgery.  (AR 317.)

On September 23, 2008, Plaintiff was admitted at Stanford Hospital for removal of the instrumentation installed by Dr. Grant.  (AR 353.)

On October 14, 2008, Plaintiff was seen again at Stanford Hospital by Dr. Park.  (AR 347.)  At the time, Plaintiff was less than one month out from the removal of her previous anterior cervical instrumentation and diskectomy.  (AR 347.)  Plaintiff's pain was reported to be 80% better than it was postoperatively.  (AR 309.)  Plaintiff reported that her pain was 3/10.  (AR 309.)  Plaintiff further reported that she no longer requires pain pills routinely, and had not taken any that day.  (AR 309.)  For her physical exam, Plaintiff sat in a chair "in no acute distress."  (AR 309.)  Plaintiff had "full motor power in the bilateral upper and lower extremities."  (AR 347.)  Dr. Park was "very pleased with [Plaintiff's] symptomatic improvement following her surgery."  (AR 347.)

On January 2, 2009, Plaintiff received a Psychiatric Review Technique from Dr. E. Murillo, M.D.  (AR 285-295.)  Dr. Murillo opined that Plaintiff did not suffer from any severe psychiatric impairment.  (AR 285.)  In terms of functional limitations, Dr. Murillo checked the box under both "None" and "Mild" with respect to "Restriction of Activities of Daily Living."  (AR 293.)  It is unclear whether this is a typographical error, or whether Dr. Murillo intended to convey a limitation somewhere in between "None" and "Mild."  Dr. Murillo checked "None" for all other functional limitations.  (AR 293.)

Dr. Murillo also authored a Case Analysis dated January 2, 2009.  (AR 296-298.)  Dr. Murillo noted Plaintiff's allegations of depression.  (AR 296.)  Dr. Murillo also noted that Plaintiff "improved significantly" after her lumbar epidural blood patch treatment in May 2008 and that her headaches resolved in June 2008.  (AR 296.)  Plaintiff reported that the pain in her arm and shoulders was 80% better than it was before her operation.  (AR 297.)  Dr. Murillo indicated that Plaintiff's depression was non-severe because she was only receiving a small dosage of medication, she never received a psychiatric referral and there was no longitudinal history of any psychological impairment.  (AR 298.)  Dr. Murillo also noted that Plaintiff did not mention depression in her initially application for benefits and did not raise the issue until she

requested reconsideration.  (AR 298.)  Dr. Murillo further opined that, since her operation, Plaintiff "has returned to at least the same level of RFC as assessed at the initial determination." (AR 298.)

On January 15, 2009, Plaintiff was seen by Dr. Park at Stanford Hospital.  (AR 306-308.) Dr. Park noted that Plaintiff's "headaches are much better" but "she continues to have pain in her left upper extremity."  (AR 306.)  When Plaintiff "holds small objects she tends to drop those due to pain which has improved postoperatively."  (AR 307.)  "At a previous visit, October 14th, she reported 80% improvement in her symptoms.  At today's visit, she reports overall 70% improvement in her symptoms."  (AR 307.)  At the physical examination, Plaintiff was "generally well-appearing, well-nourished [and] in no acute distress."  (AR 307.)  Plaintiff's [u]pper extremity motor strength is 5/5 bilaterally."  (AR 307.)  "[Plaintiff] ambulates without any difficulties."  (AR 307.)  Plaintiff reported that "she is pleased with her results" and "performs exercises at home."  (AR 307.)  Dr. Park opined that Plaintiff "will continue to heal over time, and her symptoms will continue to improve, especially with undergoing formal physical therapy." (AR 307.)

On February 2, 2009, Plaintiff was examined by Dr. Barbara L. Brammann, M.D.  (AR 399-400, 420-422.)  At that exam, Plaintiff reported pain in both arms, left greater than right. (AR 421.)  The pain is aggravated by any overhead use of her arms, or by looking down such as when reading a newspaper or driving.  (AR 421.)  Plaintiff alleviated her pain by supporting her arm close to her body or by lying down and propping it up with pillows.  (AR 421.)  Plaintiff demonstrated marked restriction in forward flexion and extension and moderate to severe limitations in rotation.  (AR 422.)  Plaintiff had free range of motion in her right shoulder but mild restriction of internal rotation but otherwise normal external rotation, flexion and adduction in the left shoulder.  (AR 422.)  Dr. Brammann recommended that Plaintiff continue physical therapy to increase her range of motion.  (AR 422.)

The medical record also includes physical therapy records from January 22, 2009 through March 25, 2009.  (AR 403-417.)  When the physical therapy began around January 22, 2009, Plaintiff reported that her headaches were 80% better, her right cervical pain was 90% better, her

1    left upper arm symptoms are 80% better, and her left handed grip was 30-40% better.  (AR 415.)

2    The physical therapist also indicated that Plaintiff possessed "[g]ood rehab potential to reach and

3    maintain prior level of function."  (AR 415.)  The most recent record dated March 25, 2009

4    indicated that Plaintiff needed to decrease her appointments due to financial reasons.  (AR 403.)

5    The record indicates that Plaintiff "tolerated treatment well" and "will follow up in a couple

6    weeks when she feels her home exercise program is ready to be advanced."  (AR 403.)  Plaintiff's

7    progress toward her goals was listed as "Good" and "patient reports better since last treatment and

8    is tolerating her home exercise program well."  (AR 403.)

9        On July 20, 2009, Plaintiff was seen by Dr. Park at Stanford Hospital.  (AR 418-419.)

10   Plaintiff "has significant improvement of her preoperative symptoms," but "still has some left

11   arm pain for which she takes a Norco pill every afternoon."  (AR 418.)  Plaintiff reached a

12   plateau after three months of physical therapy, but "is able to cope with what remains of her

13   preoperative symptoms and has no concerns to report in our clinic today."  (AR 418.)  On

14   physical examination, Plaintiff was in no acute distress, ambulated well without assistance, and

15   "has 5/5 strength on confrontational testing."  (AR 418.)

16       On November 19, 2009, Dr. Danny Anderson signed a "Questionnaire" regarding

17   Plaintiff.  (AR 401-402.)  It does not appear that Dr. Anderson authored the two-page form

18   Questionnaire, as another copy of the Questionnaire is included in the record that is identical,

19   except that it is not signed by Dr. Anderson.  (AR 436-437.)  It appears that the Questionnaire

20   was authored by an FNP (family nurse practitioner), whose name is illegible, and was signed by

21   Dr. Anderson at some later time.

22       The author of the Questionnaire opined that Plaintiff's medical problems precluded any

23   full-time work at any exertional level.  (AR 401.)  The Questionnaire described Plaintiff's

24   impairments as "cervical disc disease," "chronic pain" and "depression."  (AR 401.)  The

25   Questionnaire indicated that, in an 8 hour work day, Plaintiff could sit "20 minute/HR[1]" and stand

26

27   [1] It is unclear whether Dr. Anderson meant to convey that Plaintiff could only sit 20 minutes out of an eight hour
     workday, or whether Plaintiff could only sit 20 minutes per hour, meaning that Plaintiff could sit for 160 minutes out
28   of an eight hour work day (20 minutes per hour x 8 hours).

11

or walk "20 minute/HR." (AR 401.) The Questionnaire also indicated that Plaintiff must lie down or elevate her legs "20 min/hr" during an 8 hour work day. (AR 401.) The Questionnaire indicated that his opinions were based on Plaintiff's range of motion, but failed to identify where the cited range of motion measurements came from. (AR 401.) The Questionnaire also indicated that Plaintiff "has been extremely depressed." (AR 401.) Plaintiff could lift two pounds occasionally or frequently throughout the work day. (AR 402.) The Questionnaire also indicated that Plaintiff was limited in reaching, handling, feeling, pushing, pulling and grasping. (AR 402.) However, the limitations expressed are ambiguous, at best.[2] In response to the question "Do you feel claimant meets and/or equals Listing 1.04 (see attached)? Please explain," the author wrote "absolutely," but provided no explanation. (AR 402.)

On January 11, 2010, Plaintiff received a Psychological Disability Evaluation from Jacklyn Chandler, Ph.D. (AR 439-441.) Dr. Chandler qualified her assessment by noting that "[i]t was based on only one session of client contact, in a structured environment, with pre-authorized tests. Background and correlative information was considered to be limited." (AR 440.) Dr. Chandler opined that Plaintiff appears to meet the criteria for diagnoses of Pain Disorder Associated With Both Psychological Factors And General Medical Condition and Major Depressive Disorder, Single Episode, Moderate. (AR 441.) Plaintiff was able to understand, remember and carry out simple and complex instructions. (AR 441.) Plaintiff appeared to be able to adapt to changes in routine work settings, be able to maintain pace and persistence for the duration of the evaluation and had mild difficulty maintaining attention and concentration. (AR 441.) Dr. Chandler opined that Plaintiff appeared to be impaired in her ability to interact with the public, supervisors and coworkers, based upon moderate difficulty enduring the stress of the interview. (AR 441.)

On January 25, 2010, Plaintiff received an orthopedic evaluation from Dr. William Jackson, D.O. (AR 442-446.) Dr. Jackson noted that Plaintiff "recovered and healed well following the second fusion [with Dr. Park], but she remains significantly symptomatic." (AR

---

[2] For example, in response to the question, "How much or what percentage of an 8-hour day can the patient perform the following activities with the hands?" the author wrote "30" - 10" 3x daily" for "Reaching." (AR 437.)

442.)  Plaintiff reported pain on her right side and that any activity of the extremities causes shooting, burning pain.  (AR 442-443.)  Plaintiff reported that lying down and taking the stress off the weight of her head relieves her symptoms.  (AR 443.)  Dr. Jackson noted that Plaintiff can walk without difficulty and is able to squat, walk on her toes and heels, and tandem walk.  (AR 444.)  Dr. Jackson's diagnosis was "[s]tatus post revision cervical fusion involving three levels."  (AR 445.)  Dr. Jackson noted that Plaintiff "does not clearly have any neurologic deficit following the surgery and apparently ... has healed the fusion appropriately."  (AR 445.)  Dr. Jackson further noted that Plaintiff's left shoulder pain is likely due to "bicipital tendonitis" and "is a treatable condition."  (AR 445.)  Dr. Jackson opined that Plaintiff could stand and walk up to four hours with frequent postural repositioning, sit for up to six hours with frequent allowances for laying down to alleviate her symptoms, lift and carry 20 pounds occasionally and 10 pounds frequently at waist height, should not lift from the floor or above shoulder height, and can only occasionally climb, balance, stoop, kneel, crouch and crawl.  (AR 445.)  When seated, Plaintiff can reach, handle, finger, and feel without limitation below shoulder height.  (AR 446.)  Dr. Jackson also noted significant loss of cervical range of motion, and therefore should not work more than occasionally at heights or around heavy machinery.  (AR 446.)

On July 5, 2010, Plaintiff was examined by Robert L. Morgan, Ph.D.  (AR 448-457.)  Dr. Morgan opined that Plaintiff met the criteria for Listing 12.04, an affective disorder with marked impairment in activities of daily living and social functioning.  (AR 448.)  Plaintiff reported severe depression and chronic pain to Dr. Morgan.  (AR 449.)  No specific medical records were provided to Dr. Morgan for review prior to the evaluation.  (AR 449.)  Plaintiff reported that, since Plaintiff's surgery in September 2009, Plaintiff still suffered from constant neck pain, pain in her shoulders and arms, and headaches.  (AR 450.)  Plaintiff also reported progressive worsening of her mood and that she feels hopeless, unable to derive pleasure from the things she used to enjoy, tearful, trouble making decisions, worthless, guilty, and diminution of her energy and concentration.  (AR 450.)  Plaintiff was taking Lexapro, atenolol, Norco, Ambien and Flexeril at the time of the exam, and previously took Effexor, Cymbalta and Lyrica.  (AR 450-451.)  Plaintiff gained 25 pounds in the last year, participates less in domestic activities, naps, no

longer engages in hobbies, no longer pursues friendships, and is not a participant in any group or social organizations.   (AR 450.)   Dr. Morgan noted that Plaintiff "[a]t times did seem uncomfortable, in pain while sitting in her chair."  (AR 453.)  Dr. Morgan found Plaintiff was somewhat impaired in calculations and moderately impaired in concentration.  (AR 454.)  Dr. Morgan concluded that Plaintiff met the criteria for Listing 12.04 due to her depressive syndrome. (AR 456.)  Dr. Morgan further concluded that Plaintiff "is thought to have been disabled since the point in time that she initially applied for Disability."  (AR 457.)

Dr. Morgan also authored a Psychiatric Review Technique for Plaintiff.  (AR 459-473.) Dr. Morgan indicated that Plaintiff met Listing 12.04, as evidenced by a depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with change in weight, decreased energy, and feelings of guilt or worthlessness.  (AR 462.)  Dr. Morgan opined that Plaintiff suffered a marked limitation in activities of daily living and maintaining social functioning.   (AR 469.)   Plaintiff suffered moderate difficulties in maintaining concentration, persistence or pace.  (AR 469.)

On July 23, 2010, Plaintiff received a CT scan of her brain, without contrast, which was normal.  (AR 486.)

On July 26, 2010, Plaintiff received a lumbar puncture performed by Dr. Kimberly D. Freeman, M.D. at the Sonora Regional Medical Center.  (AR 475-477.)  Plaintiff complained of a continued headache that occurred when she was out in the garden and bent over.  (AR 476.)  At the time, Plaintiff was talking half a pill of Norco once per day for her pain.  (AR 476.)  Upon discharge, Plaintiff's doctor recommended that she take the Norco every 4 hours.  (AR 477.)

On July 27, 2010, Plaintiff received a CT scan of her brain, which was normal.  (AR 487.)

On July 28, 2010, Plaintiff received an MRI by Dr. John F. Bokelman, M.D.  (AR 479-480.)  Dr. Bokelman indicated that Plaintiff had a "2 x 1 mm punctate focus of high T2 signal in the ventral right side of the cord at the C6-7 disk level."  (AR 480.)  Dr. Bokelman stated "[o]ther etiologies such as a tiny demyelinating cord lesion related to multiple sclerosis, etc., are not entirely excluded although are much less likely."  (AR 480.)

/ / /

On August 30, 2010, Plaintiff received a CT scan of her spine and was seen by Dr. Park at Stanford Hospital. (AR 491-495.) Plaintiff reported that she felt comfortable for a year after Dr. Park's surgery, but within the last year she started having headaches, neck pain and shoulder pain again. (AR 494.) Plaintiff had a particularly severe headache when she was bending over outside. (AR 494.) Dr. Park recommended an epidural steroid injection. (AR 495.)

On September 21, 2010, Plaintiff was seen by Dr. Michael S. Leong at Stanford Hospital. (AR 498-501.) Dr. Leong indicated that Plaintiff's history and physical "is most consistent with Cervicalgia and possible Cervical Facet Arthropathy at Right C3-4." (AR 501.) Dr. Leong recommended antineuropathic medication, a "Right Cervical Medial Branch block at Right C3-4," physical therapy and psychological management. (AR 501.)

On September 29, 2010, Plaintiff received a fluoroscopy procedure performed by Dr. Jiang-Ti Kong, M.D. (AR 506.) However, there are no medical records after this date and no records describing the results.

### C.    The Vocational Expert's Hearing Testimony

David M. Dettmer testified as a vocational expert ("VE") at the hearing before the ALJ. (AR 47.) The ALJ provided the following hypothetical to the VE:

- Age: 62
- High School Diploma
- Past Relevant Work (Massage Therapist and Receptionist)
- Can sit for six hours
- Can stand for six hours
- Can walk for six hours
- Can occasionally lift and carry 20 pounds
- Can frequently lift and carry 10 pounds
- Can only occasionally climb ladders
- Can only occasionally reach overhead bilaterally
- Must avoid concentrated exposure to noise

(AR 48.) The VE testified that someone with those limitations could perform Plaintiff's prior

15

1   work as a receptionist.  (AR 48.)   The record also reflects that the VE was presented with a

2   modified hypothetical presented by Plaintiff's attorney, but the record is unclear as to the terms of

3   the modified hypothetical.[3]   (AR 49.)   The VE testified that Plaintiff could not work as a

4   receptionist under the modified hypothetical presented by her attorney.  (AR 49.)

5       **D.    The ALJ's Findings**

6           The ALJ made the following findings of fact and conclusions of law:

7   •   Plaintiff has not engaged in substantial gainful activity since May 7, 2008;

8   •   Plaintiff has the following severe impairments: degenerative disc disease and status-post

9       cervical fusion;

10  •   Plaintiff does not have an impairment or combination of impairments that meets or

11      medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

12      Appendix 1;

13  •   Plaintiff has the residual functional capacity to perform sedentary work, can sit for a total

14      of six hours out of an eight hour day, can stand and walk for a total of two hours in an

15      eight hour day, can lift and carry 20 pounds occasionally and 10 pounds frequently, can

16      only occasionally climb ladders, is limited in bilateral overhead reach, and must avoid

17      concentrated exposure to heights and hazardous moving machinery;

18  •   Plaintiff is capable of performing her past relevant work as a receptionist; and

19  •   Plaintiff has not been under a disability from May 7, 2008 through the date of the ALJ's

20      decision.

21  (AR 62-66.)

22  / / /

23  / / /

24  / / /

25

26  [3] The transcript is unclear, as there was an initial exchange between Plaintiff's attorney and the ALJ pertaining to Dr.
Anderson's report.  (AR 49.)  Plaintiff's attorney mentioned limitations including sitting for no more than 20 minutes

27  and standing and walking for no more than 20 minutes, but then got sidetracked discussing the ambiguities in Dr.
Anderson's report.  (AR 49.)  It is unclear if the sitting, standing and walking limitations were taken into account by

28  the VE.

1

**II.**

2

**LEGAL STANDARDS FOR JUDICIAL REVIEW OF SOCIAL SECURITY DETERMINATIONS**

3

4        An individual may obtain judicial review of any final decision of the Commissioner of

5   Social Security regarding entitlement to benefits.  42 U.S.C. § 405(g).  The Court "reviews the

6   Commissioner's final decision for substantial evidence, and the Commissioner's decision will be

7   disturbed only if it is not supported by substantial evidence or is based on legal error."  Hill v.

8   Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012).   "Substantial evidence" means more than a scintilla,

9   but less than a preponderance.  Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal

10  quotations and citations omitted).   "Substantial evidence is 'such relevant evidence as a

11  reasonable mind might accept as adequate to support a conclusion.'"  Id. (quoting Richardson v.

12  Perales, 402 U.S. 389, 401 (1971)).  "[A] reviewing court must consider the entire record as a

13  whole and may not affirm simply by isolating a specific quantum of supporting evidence."  Hill,

14  698 F.3d at 1159 (quoting Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).

15  However, it is not this Court's function to second guess the ALJ's conclusions and substitute the

16  Court's judgment for the ALJ's.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)

17  ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's

18  conclusion that must be upheld.")

19

**III.**

20

**DISCUSSION AND ANALYSIS**

21       Plaintiff raises five issues pertaining to the ALJ's analysis of Plaintiff's impairments.

22  Plaintiff contends that the ALJ erred by (A) not properly analyzing the significance of Plaintiff's

23  age (Pl.'s Opening Brief 4:22-5:18); (B) failing to adopt significant limitations identified by Dr.

24  Jackson and Dr. Ocrant (Pl's Opening Brief 5:19-7:4); (C) failing to provide sufficient reasons to

25  reject the opinions of treating physician Dr. Denny Anderson (Pl.'s Opening Brief 7:5-23) and

26  (D) failing to provide sufficient reasons to discredit Plaintiff's testimony (Pl.'s Opening Brief

27  7:24-8:7).  Plaintiff also contends that (E) the Appeals Council erred by concluding that the

28  evidence submitted by Plaintiff after the ALJ hearing did not affect the ALJ's decision (Pl.'s

17

1   Opening Brief 8:8-21).

2         **A.      The ALJ Did Not Err In Her Analysis Of Plaintiff's Age**

3         Plaintiff argues that the ALJ failed to properly factor her age (62 at the time of the

4   hearing) in the disability determination because the Medical Vocation Guidelines (also known as

5   "the Grids") call for a determination of disability when factoring in Plaintiff's age, residual

6   functional capacity and work history.  (Pl.'s Opening Brief 4:22-5:18.)  Plaintiff cites 20 C.F.R.

7   Pt. 404, Subpart P, App. 2, § 201.00(d) for the proposition that a disability finding was mandated.

8   Section 201.00(d) states:

9                  (d) The adversity of functional restrictions to sedentary work at
                   advanced age (55 and over) for individuals with no relevant past
10                 work or **who can no longer perform vocationally relevant past
                   work** and have no transferable skills, warrants a finding of disabled
11                 in the absence of the rare situation where the individual has recently
                   completed education which provides a basis for direct entry into
12                 skilled sedentary work. Advanced age and a history of unskilled
                   work or no work experience would ordinarily offset any vocational
13                 advantages that might accrue by reason of any remote past
                   education, whether it is more or less than limited education.
14

15   20 C.F.R. Pt. 404, Subpart P, App. 2, § 201.00(d) (emphasis added).

16         In this case, the ALJ concluded that Plaintiff was capable of performing past relevant

17   work as a receptionist.  (See AR 66.)   Accordingly, Section 201.00(d) does not mandate a

18   disability finding, because a disability finding is only warranted where the claimant can no longer

19   perform vocationally relevant past work.  Accordingly, the ALJ did not err in her analysis of

20   Plaintiff's age.[4]

21         **B.      The ALJ Erred By Failing To Adopt The Opinions Of Dr. Jackson**

22         Plaintiff argues that the ALJ erred because the ALJ's residual functional capacity was not

23   supported by the medical record, specifically by the opinions of Dr. Jackson and Dr. Ocrant.

24   (Pl.'s Opening Brief 5:18-7:4.)

25   / / /

26   _____

27   [4] However, for reasons set forth below, the Court will remand this action back to the Commissioner for further
     proceedings.  If, on remand, the Commissioner determines that Plaintiff is not capable of performing her past relevant
28   work, Section 201.00(d) may become pertinent to the disability analysis.

1    Plaintiff argues that the ALJ's residual functional capacity is inconsistent with the
2    opinions of Dr. Ocrant.  However, Plaintiff misreads Dr. Ocrant's records.  Plaintiff contends that
3    Dr. Ocrant expressed limitations in reaching in all directions (Pl.'s Opening Brief 6:23-26), but
4    the record indicates that Dr. Ocrant only expressed a limitation with respect to overhead
5    activities.  Although Dr. Ocrant checked the box associated with "Limited" in the category of
6    "Reaching all directions (including overhead)," Plaintiff ignored Dr. Ocrant's explanation below,
7    where he wrote "Limit OH activities to occasional," indicating that Dr. Ocrant's opinion referred
8    to Plaintiff's overhead reaching limitation and not any other direction of reaching.  (AR 272.)

9    The ALJ adopted Dr. Ocrant's opinions as conclusive.  The residual functional capacity
10   assessment made by the ALJ mirrors the limitations identified in Dr. Ocrant's September 11,
11   2008 report.   Dr. Ocrant and Dr. Jackson were both non-treating, examining doctors.
12   Accordingly, neither opinion is per se afforded greater weight than the other, but the ALJ "must
13   determine credibility and resolve the conflict," Valentine v. Commissioner Social Sec. Admin.,
14   574 F.3d 685, 692 (9th Cir. 2009), and "provide[] specific and legitimate reasons that are
15   supported by substantial evidence."  Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005).

16   The ALJ did not adopt Dr. Jackson's opinion regarding the need for frequent postural
17   repositioning while sitting, the need for frequent allowances for laying down, the prohibition
18   against lifting objects from the floor or above shoulder height, and the limitation to only
19   occasional climbing, balancing, stooping, kneeling, crouching and crawling.  Moreover, the ALJ
20   failed to discuss any reasons for failing to adopt these opinions.  The ALJ instead indicated that
21   she gave "substantial weight" to Dr. Jackson's opinions and adopted a residual functional
22   capacity more restrictive than that provided by Dr. Jackson.  (AR 65.)  However, this was not the
23   case.  By failing to adopt Dr. Jackson's opinions, the ALJ adopted a residual functional capacity
24   that was substantially less restrictive than that provided by Dr. Jackson.

25   Defendant argues that "the ALJ did not need to agree with everything Dr. Jackson said."
26   This is true in the abstract.  However, the ALJ is required to cite specific and legitimate reasons
27   that are supported by substantial evidence in order to depart from Dr. Jackson's opinions.
28   Bayliss, 427 F.3d at 1216.  The ALJ failed to do so here.  Having reviewed the record, the Court

fails to find any specific and legitimate reason to discredit Dr. Jackson's opinion.   The Court notes that Dr. Jackson's opinion is more than a year newer than Dr. Ocrant's opinion.   Therefore, Dr. Jackson had the opportunity to review a substantial amount of treatment records that occurred after Dr. Ocrant evaluated Plaintiff.   Significantly, Dr. Jackson's examination occurred after Plaintiff's September 23, 2008 surgery, whereas Dr. Ocrant's examination occurred before the surgery.   None of Plaintiff's activities of daily living necessarily conflict with the limitations identified by Dr. Jackson.

In this case, remand is necessary to resolve issues before a determination of disability can be made.   The record is unclear whether Plaintiff can perform her past work as a receptionist in light of the additional limitations expressed in Dr. Jackson's report because these limitations were not presented to the VE.   The Court notes that Plaintiff's attorney attempted to modify the hypothetical presented to the VE but the record pertaining to the exact terms of the modified hypothetical is ambiguous:

> Q.     Okay, let's see.  And if someone can sit for 20 minutes out of an hour, it's [sic] looks like, stand and walk for 20 minutes... Let's see here...
>
> ALJ:   I didn't hear that, counsel?
>
> ATTY:I'm trying to-this is a little confusing the way that this has this.
>
> ALJ:   You have that doctor's RFC?
>
> ATTY:The doctor's RFC?
>
> ALJ:   Well, if she can only sit for 20 minutes out of an eight-hour day, that's not going to be full-time employment.
>
> ATTY:Uh-huh.   Reaching, handling restrictions, pushing and pulling...
>
> ALJ:   I think when I looked at that, I understood it to be four percent out of an eight-hour day, or whatever that he has down there.  I'm not sure if that's correct.  He has inches and degrees, so I don't know.
>
> ATTY:Yeah, I was thinking that was minutes.  Okay.
>
> BY THE ATTORNEY:
> Q.     Let's put it down to occasional, I guess.  Handling, feeling, grasping, pushing, pulling, and I'll add forward reaching also.

| | | |
|---|---|---|
| 1 | A. | Occasional forward reaching? |
| 2 | Q. | Yes. |
| 3 | A. | Okay. |
| 4 | Q. | Would she be able to do her past work? |
| 5 | A. | No. |

(AR 49-50.)   Based on the exchange between the attorney, the ALJ and the VE, it is unclear whether the VE understood the hypothetical to include the 20 minute sitting, standing and walking limitations that Plaintiff's attorney mentioned at the beginning of the questioning. Accordingly, the VE's testimony has little evidentiary value because it is unclear if it accurately reflects Plaintiff's limitations.

The Court also notes other errata that should be resolved upon remand.  The hypothetical presented to the VE by the ALJ did not set forth the same limitations in the residual functional capacity as determined by the ALJ.  The hypothetical assumed a person who can stand and walk six hours out of an eight hour day, whereas Plaintiff was determined to only be able to stand and walk for two hours.  Plaintiff was determined to be limited to sedentary work, whereas the hypothetical did not mention a sedentary limitation.  The hypothetical did not mention limitations with respect to exposure to heights or hazardous moving machinery that were included in Plaintiff's residual functional capacity.[5]

In sum, the Court finds that the ALJ erred by failing to articulate specific and legitimate reasons supported by substantial evidence justifying the ALJ's refusal to adopt the limitations expressed by Dr. Jackson.  The Court recommends that this action be remanded to the Commissioner for further proceedings.

**C.    On Remand, The Commissioner Should Reassess Dr. Anderson's Opinion**

Plaintiff argues that the ALJ erred by failing to give sufficient reasons to reject Dr. Anderson's opinion.  (Pl.'s Opening Brief 7:5-23.)  Plaintiff argues that "Dr. Anderson was a long

---

[5] Common sense suggests that some of these limitations may not impact the VE's determination that Plaintiff could work as a receptionist, which is classified as a sedentary job.  However, given the opportunity on remand to address the limitations expressed by Dr. Jackson, the hypothetical presented to the VE should be identical in all respects to the limitations on record.

term treating physician backed by many clinical findings and 'cc' reports from other physicians, giving his opinion the greatest weight." (Pl.'s Opening Brief 7:16-19.)

1.      Legal Standards Pertaining To Opinions Of Treating Physicians

"By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians." Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527). "If a treating physician's opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given controlling weight.'" Id. (quoting 20 C.F.R. § 404.1527(d)(2)). If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the Administration considers specified factors in determining the weight it will be given." Id. These factors include (1) the length of the treatment relationship and the frequency of examination by the treating physician; (2) the nature and extent of the treatment relationship between the patient and the treating physician; (3) the amount of relevant evidence that supports the opinion and the quality of the opinion provided; (4) the consistency of the medical opinion with the record as a whole; (5) the specialty of the physician providing the opinion; (6) the degree of understanding a physician has of the Administration's disability programs and their evidentiary requirements; and (7) the degree of his or her familiarity with other information in the case record. Id. (citing 20 C.F.R. § 404.1527.)

A determination that a treating physician's opinion is not well-supported or is inconsistent with other substantial evidence does not mean that the opinion should be rejected. Id. at 631-32 (quoting SSR 96-2p). Treating source medical opinions are still entitled to deference and must be weighed using all of the factors identified above, and in many cases a treating physician's opinion should be adopted even if it does not meet the test for controlling weight. Id. (quoting SSR 96-2p).

If a treating physician's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record. Id. at 632 (quoting Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)). If a treating physician's

opinion is contradicted by another doctor, it may be rejected only for "specific and legitimate reasons" supported by substantial evidence in the record. Id. (quoting Reddick, 157 F.3d at 725). "'This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [an] interpretation thereof, and making findings.'" Id. (quoting Reddick, 157 F.3d at 725).

2.      The ALJ Properly Rejected Dr. Anderson's Opinions

Here, the ALJ concluded that Dr. Anderson's opinions were not supported by the objective medical evidence. (AR 65.)  The only record from Dr. Anderson is the "Questionnaire" dated November 19, 2009.  (AR 401-402, 436-437.)  It is unclear whether the Questionnaire was written by Dr. Anderson or whether it was simply reviewed and approved by Dr. Anderson. Notably, there are two copies of the questionnaire in the record.  One copy (AR 436-437) does not contain Dr. Anderson's name or signature, but instead contains the signature of someone who appears to be a family nurse practitioner based upon the "FNP" designation appearing after his or her signature.  There is no indication that this person examined or treated Plaintiff.  A second copy in the record (AR 401-402) is identical to the first copy, except that Dr. Anderson's signature appears below the signature line for the unidentified family nurse practitioner.  (AR 402.)  Accordingly, it appears that the report was written by someone else and Dr. Anderson, at some unknown point in time, reviewed and approved the Questionnaire.  It remains unclear whether Dr. Anderson's approval is based upon his observations from an examination of Plaintiff, from treating Plaintiff, his review or Plaintiff's records, or from other source, raising questions as to whether the Questionnaire should be afforded the level of deference normally afforded to the opinions of treating physicians.

Turning to the seven factors set forth in Orn, the Court notes that the length of the treatment relationship between Dr. Anderson and Plaintiff appears to be substantial, as Dr. Anderson was cc'd on Plaintiff's medical reports dating as far back as 2004.  However, the frequency of examination by Dr. Anderson weighs against adopting his opinions, because there is no record of Dr. Anderson ever examining Plaintiff.  Plaintiff's treatment came from referring doctors.  The nature and extent of the treatment relationship is largely unknown, given the

absence of any records that Dr. Anderson ever treated or examined Plaintiff directly.

The amount of evidence supporting Dr. Anderson's opinion and the quality of the opinion are both remarkably low.  The two page form Questionnaire fails to cite any specific evidence supporting its conclusions and there is little to no narrative describing how Dr. Anderson (or the family nurse practitioner) reached the conclusions written therein.  "When confronted with conflicting medical opinions, an ALJ need not accept a treating physician's opinion that is conclusory and brief and unsupported by clinical findings."  Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (citing Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992)).

Moreover, the limitations expressed with respect to Plaintiff's manipulative activities are poorly written.  The author of the Questionnaire expressed Plaintiff's limitations using the double prime or double quote symbol (").  For example, under the question "How much or what percentage of an 8 hour day can the patient perform the following activities with the hands?" the author wrote "30" - 10" 3x daily" with respect to reaching.  (AR 437.)  The double prime symbol (") is commonly associated with representing measurements in inches or seconds.  Inches might make sense if the author was attempting to convey how far Plaintiff could reach.  Seconds would not make much sense because it would represent a remarkably profound limitation in reaching.  A third possibility is that the author intended to convey limitations in minutes and was unaware that the single prime (') symbol is the proper symbol for representing measurements in minutes.  Further compounding the ambiguity, the author wrote "each broken up in segments of 20"" in the left margin next to the five manipulative activities.  This suggests that the author meant to convey limitations expressed in temporal duration (seconds or minutes) as opposed to distance (inches).  However, even assuming that the author intended to convey limitations in temporal duration and in minutes, it is not entirely clear what was meant by "each broken up in segments of 20 [minutes]."

The Questionnaire suffers from other notable defects.  In response to the question "Do you feel claimant meets and/or equals Listing 1.04 (see attached)?  Please explain," the author wrote "absolutely," but provided no explanation, despite the express prompting for one.  (AR 437.)  Moreover, serious questions of credibility and bias exist where, as here, the form questionnaire

24

(likely created by Plaintiff or Plaintiff's attorney) specifically prompts the respondent to indicate whether Plaintiff suffers from a single specified impairment: Listing 1.04.  Notably, the question immediately after reads: "Since what date do you believe she has been disabled to the degree set forth above," presumptuously assuming that the respondent would find Plaintiff to be disabled under Listing 1.04.  (AR 437.)  The phrasing of the question and the form as a whole is clearly leading.  See Federal Rules of Evidence 611(c) and advisory committee's note ("The rule continues the traditional view that the suggestive powers of the leading question are as a general proposition undesirable.").

There is some inconsistency between the Questionnaire and the medical record as a whole.  The opinion was written in November 2009, during a point in time where Plaintiff's condition improved significantly.  In July 2009, Plaintiff's treating physician, Dr. Park, remarked that Plaintiff's condition had been improving and that Plaintiff "is able to cope with what remains of her preoperative symptoms and has no concerns to report in our clinic today."  (AR 418.)  Moreover, the limitations expressed in Dr. Anderson's opinion are far more restrictive than those described anywhere else in the record.

Dr. Anderson's specialty appears to be internal medicine, and therefore not specific to Plaintiff's impairments.  There is no indication that Dr. Anderson is familiar with the Social Security Administration's disability programs or their evidentiary requirements.  Dr. Anderson theoretically could be familiar with other information in the case record because it was cc'd to him, but Dr. Anderson failed to cite any of this other information and there is no indication that Dr. Anderson actually reviewed any of this other information.

Given the significant issues pertaining to the Questionnaire, the Court finds that the ALJ did not err by rejecting the opinions expressed therein based upon the information available to the ALJ.  However, as noted below, substantial new evidence was obtained after the ALJ issued her decision.  This evidence corroborates Plaintiff's claim that her condition regressed and became worse around the time the Questionnaire was written.  As discussed in more detail below, Part III.E, on remand, the Commissioner should further develop the record and reassess whether the Questionnaire should be given greater weight in light of the new evidence.

### D.     On Remand, The Commissioner Should Reassess Plaintiff's Credibility

Plaintiff argues that the ALJ gave insufficient reasons to discredit Plaintiff.  (Pl.'s Opening Brief 7:24-8:7.)  The ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (AR 64.)

"[I]f the record establishes the existence of a medically determinable impairment that could reasonably give rise to the reported symptoms, an ALJ must make a finding as to the credibility of the claimant's statements about the symptoms and their functional effect." Robbins v. Social Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006).  "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." Id.  The ALJ "may not disregard [the claimant's testimony regarding his or her symptoms and their functional effect] solely because it is not substantiated affirmatively by objective medical evidence." Id.  However, "[c]ontradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony." Carmickle v. Commissioner, Social Sec. Admin., 533 F.3d 1155, 1161 (9th Cir. 2008) (citing Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995)).

Here, Plaintiff alleged that she can walk or stand for 20 minutes at a time, sit for 20 minutes at a time, and lift 2-5 pounds at the most.  (AR 42-43.)  These allegations pertaining to Plaintiff's symptoms and their functional effect are controverted by the medical record.  Dr. Ocrant opined that Plaintiff could lift up to 20 pounds occasionally and 10 pounds frequently, could walk or stand for six hours and sit for six hours.  (AR 271.)  Dr. Johnson opined similarly. (AR 445.)   The ALJ also cited several other medical records indicating that Plaintiff's impairments were not as severe as alleged and were improving.

The ALJ also discredited Plaintiff based upon her reported daily activities.   Plaintiff testified that she cooked, washed dishes, mopped, swept and did laundry.  (AR 40.)  The ALJ also cited the fact that on one occasion, Plaintiff attempted to shovel snow (AR 407) and spent one weekend running errands for her husband (AR 409).  These activities are not consistent with

someone who can lift 2-5 pounds at the most and can only stand or walk for 20 minutes at a time.

Again, based on the evidence available to the ALJ when she issued her decision, the Court finds that the ALJ did not err by discrediting Plaintiff's testimony.  However, new evidence obtained after the ALJ issued her decision casts Plaintiff's testimony in a different light because it corroborates Plaintiff's claim that her condition regressed and became worse around the time she testified at the hearing before the ALJ.  As discussed in more detail below, Part III.E, on remand, the Commissioner should further develop the record and reassess whether Plaintiff's subjective statements were credible in light of the new evidence.

**E.      The Appeals Council Did Not Err In Their Analysis Of Plaintiff's Post-Hearing Evidence**

Plaintiff argues that the Appeals Council erred by finding that the new evidence submitted by Plaintiff after the ALJ's decision did not affect the ALJ's assessment.  (Pl.'s Opening Brief 8:8-21.)  Specifically, Plaintiff submitted records from Dr. Morgan, who opined that Plaintiff's impairment met or equaled Listing 12.04.  (Pl.'s Opening Brief 8:10-13.)

"[W]hen the Appeals Council considers new evidence in deciding whether to review a decision of the ALJ, that evidence becomes part of the administrative record, which the district court must consider when reviewing the Commissioner's final decision for substantial evidence." Brewes v. Commissioner of Social Sec. Admin., 682 F.3d 1157, 1163 (9th Cir. 2012).

In addition to the records from Dr. Morgan, there are additional treatment records stemming from visits that occurred after the ALJ issued her decision in March 2010.  In July 2010, there were a series of visits where Plaintiff received CT scans, MRIs, a lumbar puncture, an epidural injection and a fluoroscopy.  Notably, during an August 30, 2010 visit, Plaintiff informed Dr. Park that she felt comfortable for approximately a year after Dr. Park's surgery in September 2008 but her condition had regressed since then.  (AR 494.)

The new evidence obtained after March 2010 casts the entire case in a new light.  At the time the ALJ issued her decision, the most recent medical evidence from Plaintiff's treating physicians indicated that the September 2008 surgery was successful, and Plaintiff's condition was greatly improved.  However, after the ALJ's decision in March 2010, new treatment records

surfaced indicating that Plaintiff's condition regressed and deteriorated.  Plaintiff received CT scans, MRIs, a lumbar puncture, an epidural injection, and a fluoroscopy procedure between July 2010 and September 2010.  Moreover, in September 2010, Dr. Leong recommended a "Right Cervical Medial Branch block at Right C3-4," antineuropathic medication, physical therapy and psychological management.

The record is not sufficiently developed for this Court to issue any findings as to the impact of the treatment records from July 2010 to September 2010.  Since the medical record abruptly ended in September 2010, it is unclear whether Plaintiff sought out the treatment recommended by Dr. Leong or whether those treatments were helpful.  Moreover, as noted by Defendant, medical records sought after an adverse disability determination lack credibility.  In this case, the record shows that Plaintiff had not sought treatment until July 2010, yet alleged that her condition had deteriorated at the ALJ hearing in December 2009.  Further interpretative evidence from medical consultants is necessary to determine whether any objective medical findings from Plaintiff's post-March 2008 treatment visits corroborate Plaintiff's subjective allegations.

On remand, the Commissioner should further develop the record to determine whether Plaintiff should be considered disabled in light of the new treatment record.  Additionally, the Commissioner should reassess Plaintiff's credibility and the credibility of Dr. Anderson's Questionnaire.  The new treatment evidence corroborates Plaintiff's allegations that her condition deteriorated after Dr. Park reported Plaintiff's condition had improved in July 2009, but the fact that Plaintiff did not seek this treatment until after the ALJ issued an adverse decision raises some questions regarding the weight that should be afforded to those treatment records.  The record should be further developed to determine whether any objective medical evidence supports Plaintiff's contention that her condition deteriorated.

## IV.

### CONCLUSIONS AND RECOMMENDATION

Based upon the foregoing, the Court finds that the ALJ erred by failing to identify specific and legitimate reasons supported by substantial evidence for refusing to adopt the limitations

expressed by Dr. Jackson.  Moreover, new evidence from Plaintiff's medical treatment records occurring after the ALJ's decision should be evaluated to determine whether Plaintiff's allegations and Dr. Anderson's Questionnaire were credible.   Accordingly, the Court RECOMMENDS that Plaintiff's appeal from the administrative decision of the Commissioner of Social Security be GRANTED and that this action be REMANDED to the Commissioner for further proceedings consistent with this opinion.

These Findings and Recommendations are submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within 14 days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **March 15, 2013**

UNITED STATES MAGISTRATE JUDGE